UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| V. | * | Cr. No. RDB-23-210 |
| **DAVID EPSTEIN** | * | |
| Defendant | * | |
| For: DAVID EPSTEIN | * | |

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

Defendant, David Epstein, though his undersigned counsel, hereby submits this memorandum in aid of sentencing and states:

## INTRODUCTION

David Epstein pled guilty to on count of wire fraud in violation of 18 USC sec. 1343, arising out of a loan application filed nearly five years ago at the start of the COVID pandemic.   Epstein acknowledges and agrees that he changed the business name on the bank record he provided to the lender (but none of the amounts on the bank statement) and that such submission was fraudulent.   The loan had already been approved at this point and the bank needed an account into which to wire the funds. It is unquestioned that although the loan had been approved, the money could not have been transferred absent the false bank statement.

However, this case is not one with a fictitious company, exaggerated payroll estimates or theft of Government funds to which the defendant was not entitled.   Rather, as detailed below, his company, PEI Staffing, Inc., qualified for the loan and for the amount requested. PEI   received a loan of $1,307,170.00 and was required to spend 80%

of the loan on payroll and related business expenses, which it did. The loan amount was legitimate and the payroll expenses were made as the law required. In addition, many of the actions that t he Government alleges were "fraudulent" are, in fact, upon examination, not fraudulent at all.

Nevertheless, a false statement is a false statement and the guilty plea was entered. Mr. Epstein has no prior record in his 46 years and has been on release in this case since August 3, 2023, ECF 10, without incident. This offense occurred nearly five years ago. In light of the defendant's history and the circumstances of this case, a jail term might well be determined to be properly served in home confinement. The defendant respectfully requests an appropriate period of home confinement as a sentence that meets the goals of federal sentencing.

## DEFENDANT'S SENTENCING POSITION

   I.   The PPP Loan Requirements

On March 27, 2020, Congress passed the CARES Act, Pub. L. 116-136, that allocated nearly 3.5 billion dollars in low interest, and forgivable, loans to held companies affected by the COVID pandemic. According to the regulation issued on April 15, 2020, to obtain a Paycheck Protection Program (PPP) loan, a company had to meet two criteria: have fewer than 500 employees and, as of February 15, 2020, have an ongoing business with employees on the payroll. 85 Fed. Reg. 20812 (effective date 4/15/2020), attached hereto as Exhibit 1. PEI Staffing, Inc. (PEI), met both of these requirements. PPP loans were directed by the Small Business Administration (SBA). The SBA issued a "Paycheck Protection Program Borrower Application Form", which

was part of the package sent to applicants in the PPP application process. That form, attached hereto as Exhibit 2, explained how applicants were to determine the amount of loan they could seek.

The form stated: "For purposes of calculating "Average Monthly Payroll," most Applicants will use the average monthly payroll for 2019, excluding costs over $100,000 on an annualized basis for each employee." Exh. 2 at p. 3. The form then directs the applicant multiply the average monthly payroll by a factor of 2.5 to determine the amount of the loan. This form was part of the application package provided to PEI by the Lender, Bluevine.

For 2019, PEI filed quarterly federal tax returns, Form 941, that reflect the wages, tips and other compensation paid by PEI for the quarter. For 2019, the quarterly returns showed payroll costs as follows

```
Q1:     $2,289,260.52
Q2:     $2,360,177.75
Q3:     $1,654,256.21
Q4:     $   493,594.16
TOTAL: $6,797,288.63.
```

Each of the 941 forms are attached hereto as Exhibits 3-6. The 2019 total PEI payroll was $6,797,288.63 which, divided by 12 months yields an average monthly payroll of $566,440.72. Epstein reported an average monthly payroll of a _lower_ amount - $522,868. PEI was therefore entitled to a loan of 2.5 the actual monthly average amount, or $1,045,736.00; PEI actually sought a lower amount of $1,307,170.00. The, as required, PEI spent $1,086,899.36 on payroll, in excess of the 80% of the loan. Exhibit

7.[1]

Thus, the loan amount was legal and appropriate.[2] The Program required that a company spend 80% of the amount of the loan on proper business expenses; PEI paid over 80% in payroll costs. There are no materially false statements on the PPP application. The only falsehood arose when Mr. Epstein replaced "Stafquik, Inc." with "PEI Staffing" on the bank statement submitted so that the bank would have a destination to send the loan funds. To understand how this occurred, a correct version of both PEI and Stafquik is needed.

II. PEI and Stafquik - Interrelated

PEI is a staffing company that was incorporated on August 25, 2010 to perform employment and staffing services. The Statement of Facts suggests that Stafquik was created in 2020. The sole owner of PEI was not David Epstein - it was Danielle Epstein. David was an employee of PEI and never had ownership of PEI. In 2016, the defendant got the idea that PEI could become an internet app. Stafquik was incorporated on May 2, 2016, with Mr. Epstein as President of the company.[3] Stafquik is a wholly owned subsidiary of PEI, not an "unrelated" company. The Statement of Facts states that after

---

[1] PEI is a staffing company that pays its employees through a company called Paychex, also doing business as Advance Partners. Exhibit 7 is a spreadsheet from Advance partners that shows the payroll paid by Advance on behalf of PEI.

[2] The Statement of Facts indicates that the the number of employees on the application was inaccurate. First, it was not. More importantly, the number of employees is not material to a PPP loan application. The only criteria were that the company had fewer than 500 employees, which PEI did, and that the company was in existence as of February 15, 2020, which PEI was. As long as the average monthly wages figure was correct, and here it was lower than the full amount, the number of employees is irrelevant.

[3] The incorporation papers from the State of Maryland for PEI and Stafquik are attached hereto as Exhibits 8 and 9, respectively.

receiving the PPP funds he paid "debts unrelated to PEI including debts belonging to a business that defendant was attempting to start called Stafquik."  ECF 23-1. at 1.  That statement is inaccurate - Stafquik and PEI are fully related and Stafquik began four years earlier.

Danielle Epstein has had physical medical issues for over a decade.  She had surgery on her hip years ago and in the Spring of 2020 had a torn labrum that needed surgical repair.  She was barely able to walk and was in constant pain.  Due to family disputes and monetary conflicts, by early 2020, the PEI bank accounts had been closed and both companies were being run through either Stafquik's accounts or the defendant's personal accounts.  Thus, even before the PPP loan was made, expenses for PEI and Stafquik came out of David Epstein's personal accounts.

   III.   This PPP loan

COVID struck to close down most businesses in March, 2020.  In April, 2020, the federal Government made loans available for companies to help them try to survive.  Given that PEI was a staffing company, the shuttering of companies hurt PEI's income.  In late April, 2020, Epstein, on PEI's behalf, applied for a PPP loan.  The loan was approved almost promptly on April 30, 2020.[4]  The only remaining item for the loan was to provide an account into which the funds could be placed,  Without an account in the specific name of PEI, and with Mrs. Epstein unable to go to the bank to sign for a new account (assuming any banks were actually open at the time), David Epstein used the Stafquik bank account and changed the company name on the account to match the

---

[4]   Attached Exhibit 10 is from the lender bank and shows that as of April 30, 2020, the loan was listed as "approved."

company name on the loan.    (Discovery in this case includes a phone call from Epstein to the lender in which he expresses his worry that he might have already been too late to obtain what he perceived to be a limited pool of funds).    Although this change created a fabricated bank statement, the loan had already been approved and this change had no effect on the bank approving the funds.

The Government also suggests that other expenses by Mr. Epstein using PPP funds were inappropriate.   At the time of the loan, many aspects of the Program were unclear - the SBA was issuing new regulations almost weekly.   What was clear were the requirements for loan forgiveness published at the time.   As reflected in a document issued later in the Program, to obtain loan forgiveness, a borrower was <u>not required</u> to show that the money spent on payroll was <u>the same as</u> the money received in the loan.

Rather, the documentation required was "Bank account statements or third-party service provider reports documenting the amount of cash compensation paid to employees."   See SBA issuance, Exhibit 11 hereto.   Nothing required a company to show a direct path from the loan proceeds to the payroll, only that the amount of payroll expended exceeded 80% of the loan amount.   Indeed, the loan application states that "I understand that loan forgiveness will be provided for the sum of documented payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities, and not more than 25% of the forgiven amount may be for non-payroll costs."   See Exhibit 12.   Thus, so long as the proper amount was spent on salary, there did not appear to be a strict requirement that   the precise funds lent be used directly for payroll.

IV. <u>Character of This Defendant</u>

The Government attempts to paint Mr. Epstein as some conniving fraudster with the goal of stealing, and hiding, money from the federal coffers. Such allegations are unfounded. The loan amount was appropriate and legal based on the requirements of the SBA at t he time of the loan. More money was spent on payroll than the law required. And, the idea that David Esptein was a criminal is inconsistent with every other part of his life.[5] Several members of the community and the defendant's family, who have known him for decades, describe him as a loving and dedicated father, husband, community member and respected businessman.

As discussed above, Epstein primary business was with Advance Partners. Attached hereto as Exhibit 13, is a letter from Joel Adelman, the former CEO of Advance. Mr. Adelman has known Epstein for 15 years and describes the defendant as having "outstanding integrity" and as a mentor to other entrepreneurs. Similarly, Deborah Schneider, CEO of CrossFire Managed Services, Inc. states that Epstein "is a consultant to my business, and we rely on his expertise to help support our Mid-Atlantic office."

---

[5] Several examples detail the misconception by the Government when it claims that Epstein improperly used PPP funds. First, they allege he used funds wrongly to "renovate his house." In fact, those funds simply advanced monies Epstein was already owed by insurers due to a flood in his home and a fire in his office, both in the Spring of 2020. Another example is the use of PPP funds to pay for a company car, a 2019 Mercedes. This car was purchased not in 2020, but in April, 2019. See Exhibit 18. PEI had been buying company cars for Epstein's work purposes since 2001 - including new Mercedes vehicles in 2013, 2016, 2018 and 2019. These were business expenses. The Government also suggests that the rapid movement of funds immediately following receipt of the PPP funds indicated an attempt to "conceal" the funds; from whom? The Government was fully aware of the funds being provided - moving the funds into other accounts, in Stafquik's and his own name, is hardly concealing anything.

Exhibit 14.   Gregory Klar, a CPA and Epstein's brother-in-law reflects that the defendant has helped to create "hundreds of jobs" in the local community through his staffing companies. Exhibit 15.   As he explains "From the food in cafeterias to the deliveries that reach homes and businesses, from the roads we drive on to the events and attractions that bring the city together, David's contributions have quietly supported the daily lives and economic growth of many in Baltimore."

People who know him personally explain his dedication as a father to his son and daughter.   Michael Funk, a cardiologist who is Epstein's cousin, talks about the defendant's ongoing dedication to his family and states that David is "one of the most honest and reliable individuals I have ever met."   Exhibit 16.   Another cousin, Jason Rubin, concurs: "I also know with certainty that this moment is not reflective of the man I have always known him to be. David has never had any prior issues with the law, and his track record as a responsible, loving, and hardworking individual speaks volumes about his true character. He is a leader in his family and his community, someone who consistently puts others before himself."   Exhibit 17.   And his devotion to his family has not been without its difficulties.

His son has an extremely rare liver disease, Dihydrolpioamide Dehydrogenase Deficiency (DLD), that strikes fewer than one in one million persons.   While most infants born with this illness die before one year of age, Jack Epstein has survived through his teen years.   There is no cure for DLD.   When symptoms flare up, Jack's liver fails and he needs to be hospitalized.   One of his parents needs to be with him in the hospital.   When his mother was nearly immobile in late 2019 and early 2020, that

responsibility fell to David alone. Since, then, including as this memorandum is being written, Jack has been hospitalized 14 times, once in 2021 and again. And, because stress can cause flare ups, Jack has been in the hospital for liver failure seven times since his father was indicted in this case.

Mr. Klar provides an accurate description of David Epstein in his current situation: "David is not a hardened criminal; David is a man who made poor choices during a difficult time, and he is eager to move forward in a way that allows him to continue contributing to his community and caring for his family."

V.   Determining the Advisory Guideline Range

Although advisory only, the starting point for sentencing is determining the applicable guideline range. The plea agreement provides that the base offense level is 7, plus 14 levels for the amount of the "loss", plus and additional two levels because the money came from a financial institution.[6] Mr. Epstein qualifies for three levels off for his acceptance of responsibility and an additional two levels off for being a zero point offender under USSG sec. 4C1.1.(a). The agreed final level is either 20 or 18.

The parties disagree whether another two levels apply here for the use of "sophisticated means" under USSG sec. 2B1.1(b)(10)(C) (where "the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the

---

[6] "Loss" is defined as "(i) "Actual loss" means the reasonably foreseeable pecuniary harm that resulted from the offense.(ii) "Intended loss" (I) means the pecuniary harm that the defendant purposely sought to inflict…" USSG sec. 2B1.1(b)(1)(C). Here, there is no actual loss - the loan was appropriate and PEI was entitled to the funds under the Program. And, the correct amount of funds was spent as required on payroll. However, because a false statement was ultimately used for the funds to be acquired, the amount of the loan would serve as the proper amount for the "loss" enhancement.

conduct constituting sophisticated means…"). The application Notes to this subsection show why this enhancement does not apply to Mr. Epstein's case.

Application Note (B) provides:

> <u>Sophisticated Means Enhancement under Subsection (b)(10)(C)</u>.—For purposes of subsection (b)(10)(C), "sophisticated means" means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. For example, in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means.

The defendant changed the name on a bank account from Stafquik to PEI Staffing. That change was neither especially complex or intricate. Those companies are related and do business together - no fictitious entities or corporate shells were created to effectuate this offense. This enhancement does not apply here.

## CONCLUSION

For the reasons stated herein and to be presented at a hearing on March 26, 2025, the defendant respectfully requests a sentence of an appropriate period of home confinement.

Respectfully submitted,

_____/s/_____
Richard Bardos, Of Counsel
Schulman, Hershfield & Gilden, P.A.
1 East Pratt Street, 9th Floor
Baltimore, Maryland 21202
(410) 332 0850

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 19th of March, 2025, a copy of the foregoing was served electronically by ECF to: Office of the United States Attorney, 36 South Charles Street, Fourth Floor, Baltimore, Maryland 21201 and all defense counsel.

_____/s/_____
Richard Bardos